# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| HILDA L. SOLIS,<br><br>                               Plaintiff,<br><br>v.<br><br>MILK SPECIALTIES COMPANY,<br><br>                             Defendant. | Case No. 11-MC-72-JPS<br><br><br>ORDER |

       On November 18, 2011, plaintiff Hilda L. Solis, U.S. Secretary of Labor ("Secretary"), filed a Petition to Enforce Administrative Subpoena Duces Tecum (Docket #1). The petition seeks an order requiring defendant Milk Specialties Company ("MSC") to produce two documents pursuant to an administrative subpoena served upon MSC. On November 22, 2011, this court issued an Order to Show Cause and a hearing was ultimately held on January 5, 2012. The court made no decision at the hearing, but rather required MSC to submit the documents for *in camera* review and allowed the parties to file further memoranda in support of their respective positions. Having reviewed the documents in question and considered the parties' arguments, the court will grant the petition and order production of the documents.

       At issue is MSC's refusal to provide two documents in response to an administrative subpoena issued by the Secretary. On August 15, 2011, the Occupational Safety and Health Administration ("OSHA") initiated an inspection of MSC's Fond du Lac, Wisconsin, facility. The inspection followed a report of a fire resulting from a dust explosion in a machine. Subsequently, OSHA served MSC with the subpoena to which MSC objected

to the production of only two documents on grounds of attorney-client privilege and the attorney work product doctrine. The two documents are a "Five Year Strat Plan" for combustible dust and a combustible dust review report ("Dust Report") prepared by Bill Looser, MSC's Vice President of Environmental, Health and Safety.

The Occupational Safety and Health Act permits the Secretary to compel production of evidence during inspections and investigation. 29 U.S.C. § 657(b). Where a person refuses to obey such an order, U.S. district courts have jurisdiction to issue an order requiring the production of such evidence and the authority to punish further refusal as a contempt of court. 29 U.S.C. § 657(b). The district court must determine the charge by OSHA appears valid, the requested documents are relevant, and the information requested is not overly indefinite or sought for an illegitimate purpose. *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984). MSC does not contest the the authority or enforceability of the subpoena, but merely asserts privilege. On that note, privilege applies equally to non-disclosure of documents under an administrative subpoena as it does elsewhere. *See, e.g.*, *U.S. Dep't of Educ. v. Nat'l Collegiate Athletic Ass'n*, 481 F.3d 936, 938 (7th Cir. 2007) ("there are privileges that can be used to keep information from government agencies"). Thus, should a privilege exist, it would operate to shield the documents from disclosure. However, the court finds no privilege or work product protection.

The attorney-client privilege protects communications "[w]here legal advice of any kind is sought" from a lawyer. *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). Where the communications are made in confidence by the client for that purpose, they are permanently protected except where the privilege is waived. *Id.* By the same token, the privilege

protects only communications, not the underlying facts. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). The party invoking the privilege bears the burden of establishing its existence, and the scope of the privilege is narrowly construed. *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991). Carrying that burden is more difficult in the context of in-house counsel because counsel is often involved in business matters as well as legal. 1 Paul R. Rice, *Attorney-Client Privilege in the U.S.* § 3:14 (2011); *see also Am. Nat'l Bank & Trust Co. of Chi. v. Equitable Life Assurance Soc'y of U.S.*, 406 F.3d 867, 879 (7th Cir. 2005) (citing *Attorney-Client Privilege*). Thus, where the purpose of the communications is to secure business advice, rather than legal advice, the attorney-client privilege does not apply. *See Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003) (privilege covers legal subjects, and "hard to see why a business evaluation meets that description"); *see also, e.g., Sandra T.E. v. S. Berwyn Sch. Dist.*, 600 F.3d 612, 620 (7th Cir. 2010) (citing *Burden-Meeks* for the proposition); *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984) (privilege applies only upon showing advice given in legal capacity).

As to the work product doctrine, a party need not disclose materials prepared "in anticipation of litigation," including both opinion work product and ordinary or fact work product. Fed. R. Civ. P. 26(b)(3)(A); *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 616 (N.D. Ill. 2000); *see also, e.g., United States v. Nobles*, 422 U.S. 225, 237-38 (1975). The protection extends to materials prepared for the attorney by agents. *Nobles*, 422 U.S. at 238-39. The doctrine is intended to protect attorney thought process and mental impressions, as well as "to limit the circumstances in which attorneys may piggyback on the fact-finding investigation of their more diligent counterparts." *Sandra T.E.*, 600 F.3d at 622. Again, the burden of establishing

the privilege rests on the party invoking it. *Caremark*, 195 F.R.D. at 616. The "in anticipation" standard means that the materials "can fairly be said to have been prepared or obtained *because* of the prospect of litigation." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976-77 (7th Cir. 1996) (emphasis in original). The Seventh Circuit further elaborated that the standard requires distinguishing between materials prepared in the ordinary course of business "as a precaution for the remote aspect of litigation" and those prepared "because some articulable claim, *likely* to lead to litigation…ha[s] arisen." *Id.* at 977 (emphasis and alteration in original). Despite protection, a party may still force disclosure if it establishes "substantial need" for the material and the inability to obtain the equivalent without "undue hardship." Fed. R. Civ. P. 26(b)(3)(A)(ii).

A case from the Eastern District of Pennsylvania is instructive in its similarity to the instant case. There, in a grand jury matter, an intervenor company sought to quash a subpoena issued to its environmental consulting firm and receive a protective order. *In re Grand Jury Matter*, 147 F.R.D. 82, 83 (E.D. Pa. 1992). The intervenor was under investigation for allegedly violating federal criminal statutes related to handling and disposal of hazardous waste. *Id.* The documents the intervenor instructed the consultant to withhold were alleged to fall under both the attorney-client privilege and the work product doctrine. *Id.* at 84. Prior to the grand jury investigation, the intervenor had also been the subject of state proceedings related to waste management violations. *Id.* The intervenor asserted that it had hired a law firm to provide legal advice regarding the state proceedings and that the firm had hired the consultant in question in order to allow the firm to render legal advice to the intervenor. *Id.* Thus, the intervenor argued

that the documents were prepared for the purpose of providing environmental legal advice. *Id.* After reviewing the documents *in camera*, the court rejected application of both the attorney-client privilege and the work product doctrine. *Id.* As to the attorney-client privilege, the court determined the documents were created for the provision of business advice, not legal advice. *Id.* at 85-86. The court specifically found that the documents "were made solely in the course of the expert consultant's preparation of a waste management plan that would achieve regulatory compliance for the company's waste disposal practices." *Id.* at 85. As to the work product doctrine, the court rejected its application while noting that the documents memorialized interviews regarding waste handling procedures and observations and impressions after witnessing procedures, facilities, and after review of documents detailing procedures. *Id.* at 87. The documents also included "proposed methods" of neutralizing and disposing of chemicals, and the types of drums to use for transportation. *Id.* The court ultimately found nothing revealing legal theories or opinion of the law firm. *Id.*

The court has reviewed both documents in the case at hand and finds they are both aimed at business advice and were not prepared in anticipation of litigation. The Dust Report is a collection of technical process diagrams related to various MSC facilities, as well as cost estimates for various equipment that *could* be installed in each facility. The listed equipment is a product of Mr. Looser's opinion as to opportunities to improve National Fire Protection Association ("NFPA") standards compliance given the existing equipment and process in each facility. The Dust Report begins with a brief introduction that establishes the purpose of the report, as well as Mr.

Looser's assumptions underlying his opinion, as well as a summary table of the estimated costs related to all noted potential equipment upgrades or installation. In arranging the pieces of equipment and individual cost estimates, the page for each facility also presents a prioritization by Mr. Looser as to which equipment might be installed first. As the introductory page summarizes and explains, Mr. Looser essentially assembled an estimate as to what equipment would likely be necessary in order to meet (or progress toward satisfying) NFPA standards, how much it might cost based on rough vendor quotes, and his opinion as to what order installations should probably occur in.

The Five Year Strat Plan is,, in some respects, an extension of the Dust Report. It contains a retrospective look at steps taken during the first year, 2010, of which OSHA already has knowledge. The next four years lay out Mr. Looser's opinion as to additional steps that could be taken to meet or improve compliance with NFPA standards. The document essentially opines as to when MSC should initiate installation of the various priority levels of equipment identified in the Dust Report, and suggests a few prerequisites to installation, such as getting price quotes and hiring contractors.

The documents do not fall under the attorney-client privilege. First, none of this material is itself legal advice. Further, MSC has not carried its burden of showing that these documents are communications made to in-house counsel for the purpose of securing legal advice. In MSC's memorandum, it argues that the Secretary can secure the technical information and cost estimates from other sources, and further that the arrangement of what equipment might be installed at each facility and Mr. Looser's prioritization as to any installation is the type of "non-factual"

material that should be protected in order to allow an attorney to render legal advice. The problem is that MSC has failed to carry its burden of explaining, let alone convincing the court, exactly how this information is relevant to *legal* advice. On December 30, 2008, OSHA commenced inspection of MSC's facility in Whitehall, Wisconsin. OSHA issued a citation on June 22, 2009, alleging violation of the Occupational Safety and Health Act's General Duty Clause through existence of combustible dust hazards without proper prevention and protection. The Secretary then filed a complaint with the Occupational Safety and Health Review Commission. Subsequently, the parties negotiated and entered a stipulation and settlement, effective April 12, 2010. MSC later closed the Whitehall facility on January 10, 2011. On January 17, 2011, MSC's in-house counsel, Attorney Kang, emailed Mr. Looser, prompting him to begin the process which resulted in the Dust Report and Five Year Strat Plan; he prefaced the request with the statement, "[i]n anticipation of potential litigation." On March 1, 2011, a formal employee complaint at MSC's Boscobel, Wisconsin, facility obligated OSHA to conduct a new investigation and resulted in a citation on July 12, 2011. On August 15, 2011, in response to a referral regarding a fire incident, OSHA instigated the inspection of the Fond du Lac, Wisconsin, facility at issue here. Thus, Attorney Kang's communication to Mr. Looser occurred after settlement of the Whitehall proceeding, after closing the facility, and prior to initiation of the Boscobel or Fond du Lac investigations.[1]

---

[1] MSC states that the Boscobel litigation began before completion of the documents, but it is the attorney's request that marks whether preparation occurred while anticipating litigation.

According to MSC, during the Whitehall facility proceedings, OSHA took the position that, in order to comply with the General Duty Clause of the Occupational Safety and Health Act, MSC was required to meet NFPA standards. MSC asserts that the documents in question provide a basis for in-house counsel to render advice as to mitigating the risks of additional litigation as well as possible defenses and financial exposure if OSHA's statutory interpretation is accepted. However, without further explanation, it appears the only advice Attorney Kang could provide to MSC, as a result of Mr. Looser's opinions, is how to come into compliance with OSHA's understanding of regulatory requirements. This is, at bottom, business advice. The only conceivable advice relates to the fact that if OSHA's interpretation is correct, MSC will need to spend money to comply. In essence, the advice is that MSC can avoid legal trouble by complying with the law. That advice does not require an expert analysis of whether MSC has actually met NFPA standards and how it could do so. Moreover, it would not constitute legal advice if Mr. Looser had independently informed MSC's management of how to comply with regulations; coming from the mouth of an attorney does not change that.

Instead, this case is all but identical to the Eastern District of Pennsylvania case. There, as here, a company became embroiled in legal proceedings over its violation of regulatory requirements, and its attorney, in turn, employed an expert on those regulations to determine how to come into compliance with them. That is simply smart business. The fact that the NFPA standards have not been conclusively determined to be the guiding light of the General Duty Clause does not disturb this conclusion. This is not a situation where Attorney Kang has developed his own theories as to how

OSHA might attempt to show MSC is out of compliance and in turn engages Mr. Looser in evaluating whether OSHA might succeed if it did pursue such a line of attack.  Thus, in the final analysis, the court is simply not convinced that Mr. Looser's opinions and their factual bases were assembled for the purpose of providing legal advice.  Both documents are, therefore, outside the attorney-client privilege.

Somewhat similarly, neither do the documents fall under the work product doctrine.  For one, the fact that the documents were not prepared in anticipation of litigation follows from the finding that the documents were prepared for the purpose of providing business advice rather than legal advice.  But even placing that aside, the Whitehall litigation had been completed when Attorney Kang requested that Mr. Looser prepare the documents in question, and the prospect of litigation involving other MSC facilities, while perhaps not remote, certainly did not rest on any *articulable claim* likely to lead to litigation.  To the contrary, the events giving rise to the Boscobel and Fond du Lac investigations had yet to occur, and it is unlikely that MSC could have predicted them.  The most MSC could predict was that it might suffer another combustible dust incident that would in turn lead to further OSHA involvement.  MSC likely could not, and has not argued that it could, predict the specific events leading to both subsequent investigations. But allowing the possibility of future litigation to qualify as "anticipation" on the basis of past alleged non-compliance with regulations would be barely distinguishable, if at all, from allowing that possibility to qualify on the basis of the simple fact that a company must comply with regulations generally. To so hold would be to cloak from public view every audit, report, or other assessment of regulatory compliance and methods of coming into compliance

simply by passing it through a request from in-house counsel. There is no basis for such a holding.[2] Again, this case is in line with the Eastern District of Pennsylvania's grand jury matter. There, opinions and plans for regulatory compliance, though obtained through counsel, did not reveal legal theories or mental impressions; the same is true here. These documents reveal little more than that MSC may want to install equipment that will satisfy OSHA's view of the General Duty Clause (again, a business decision).

Regarding the work product doctrine's concern over allowing parties to piggy-back on the factual development of the opposition, MSC states that it should not be required to "identify for OSHA the facts that it believes are significant as a legal matter." Presumably, MSC means that, though the facts contained in the documents are discoverable, it need not produce them in such a collected fashion because OSHA may obtain them through its own diligent discovery.[3] If that were MSC's actual concern, it would have no reason to object to questions at Mr. Looser's deposition that seek to discover these facts. But MSC did object. At Mr. Looser's deposition, OSHA's counsel asked whether it was his intent to get all MSC facilities up to current NFPA standards. (Secretary's Resp. Ex. C, at 113:23-25) (Docket #11-3). Mr. Looser responded that they are always looking to make and prioritize improvements. (Secretary's Resp. Ex. C, at 114:1-9). Counsel for the Secretary then asked what improvements were being prioritized and MSC's

---

[2]MSC states that Attorney Kang correctly anticipated that OSHA would commence additional investigations based on its interpretation of the General Duty Clause, but the investigations only occurred in response to discrete safety incidents.

[3]To the extent MSC's argument is, instead, against disclosure of facts that will reveal legal impressions or theories, the court has disposed of that argument above.

counsel directed Mr. Looser not to answer. (Secretary's Ex. C, at 114:10-20). Thus, MSC appears to argue that it need not provide OSHA a shortcut by producing these documents, but neither does it need to disclose the facts to OSHA when specifically sought either. As such, not only is there a lack of concern that MSC would be doing OSHA's work for it, but this even tends to establish OSHA's substantial need and undue hardship—though the court need not make that finding given the inapplicability of the work product doctrine in the first instance. In sum, MSC has failed to establish that the work product doctrine applies by failing to show the documents were prepared in anticipation of litigation. Additionally, neither of the doctrine's underlying policies are implicated here. As such, finding no privilege or work product protection, the court will order the two documents disclosed.

Accordingly,

IT IS ORDERED that the plaintiff's Petition to Enforce Administrative Subpoena Duces Tecum (Docket #1) be and the same is hereby GRANTED.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge